ARKWRIGHT MILLS v. AULTMAN & TAYLOR MACHINERY CO.

(Circuit Court of Appeals, First Circuit. January 26, 1906.)

No. 605.

1. SALES—ACTION FOR BREACH OF WARRANTY OF BOILERS—EFFECT OF DELAY IN MAKING TEST.

Plaintiff purchased boilers from defendant under a warranty as to their evaporating capacity, as shown by a test to be made by a person named in the contract. *Held,* that in view of plaintiff's right at its election to retain the boilers in any event, and to recover damages in case they did not comply with the warranty, it was not bound to have the test made at once, but that such test was within a reasonable time and in compliance with the contract, if made while the boilers were in such condition that they could be fairly tested.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 794.]

2. SAME—CONSTRUCTION OF WARRANTY.

Under a warranty of the capacity of a battery of boilers sold, under stated conditions, which designated a certain expert to make the test, if two kinds of tests were made in practice, one a guaranty test to determine maximum efficiency, and the other a working or commercial test to determine practical efficiency, and the contract contained no provision as to which should be made, the parties must be supposed to have intended to leave that matter to the determination of the expert, in view of the terms of the contract and warranty.

3. SAME—QUESTIONS FOR JURY.

In an action to recover damages for breach of a warranty of boilers sold, whether a test was made in accordance with the terms of the war-

ranty, and whether, if not, the test actually made was accepted by the parties as a sufficient test under the contract, *held*, under the evidence, to have been questions for the jury, as well as the final question whether the test made showed a compliance with the warranty.

4. CONTRACTS—CONSTRUCTION—ACTION FOR BREACH.

By a contract for a sale of boilers by defendant to plaintiff, defendant was required to furnish plans and specifications for the setting, and to direct and supervise such erection and setting up·in a proper and skillful manner. Defendant furnished the plans and specifications and a superintendent to direct and supervise the work, and plaintiff employed a third person to furnish the materials and labor. By direction of defendant's superintendent, certain tying of the brickwork called for by the specifications was omitted, as a result of which the setting was defective and caused damage to plaintiff. *Held* that, in the absence of proof that plaintiff knew of and acquiesced in the variance, the same was chargeable to the default of defendant to furnish proper and skillful superintendence, and that under the evidence the question of such acquiescence was one for the jury.

In Error to the Circuit Court of the United States for the District of Massachusetts.

See 128 Fed. 195.

James M. Morton, Jr. (Jennings, Morton & Brayton, on the brief), for plaintiff in error.

Marquis F. Dickinson and Walter Bates Farr, for defendant in error.

Before COLT, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge. This writ of error is for review of the ruling of the Circuit Court that the plaintiff was not entitled to go to the jury on the first, second, and third counts of the plaintiff's declaration, and for review of certain rulings on questions of evidence.

The contract made May 19, 1897, concerning the sale of boilers, contained the following warranty:

"We furthermore guaranty that these boilers will show an evaporation of 10½ lbs. of water from and at 212° per lb. of dry Pocahontas coal, 1 inch draft, Prof. George H. Barrus to make the test."

The burden was upon the Arkwright Mills, as plaintiff suing upon this warranty, to prove that the required test was made by Prof. Barrus, and that under such test the boilers did not show the required evaporation.

It was in proof that the boilers were set during the fall and winter of 1897–1898, and that steam was put on them in February or March, 1898. The plaintiff offered evidence that a test was made by Prof. Barrus, the engineer named in the warranty, April 12 to 15, 1899. The Circuit Court was of the opinion that this test was too late, and also that the test proved was not such a test as was called for by the contract.

The Circuit Court was of the opinion that the law required the plaintiff, if it desired to act upon the warranty, to act promptly, and to call Mr. Barrus down to make a test as soon as it reasonably could be done; and, if the boilers did not answer the test, to notify the de-

fendant promptly, and let the defendant take out the boilers while they were worth something for some other purpose. In fact, the rulings of the Circuit Court upon the question of reasonable promptness seem to be based entirely upon the consideration that, if the boilers did not fulfill the requirements, the defendant should be given an opportunity to take them out while in good condition and practically new. In deciding, however, whether this test was made within a reasonable time, it should be borne in mind that the purchaser of the boilers had an option, upon a breach of the warranty, to return the boilers, or to retain them, and to claim as damages the difference between the value of the boilers actually received and the value of the boilers contracted for. It was obvious in this case that the plaintiff had elected to retain the boilers, and to seek compensation in damages for breach of warranty. Upon this view, the test would be made in a reasonable time, provided the boilers were then in such a condition that they could be fairly tested.

Our attention has been called to no evidence in the case having a tendency to show that a test under the warranty could not have been made as fairly in April, 1899, as a year earlier. In fact, the plaintiff produced evidence, which was not contradicted, to the effect that a battery of boilers a year old, if kept in good condition, ought to run a little better than it would right after it was set up. It is very clear, we think, that it should not have been ruled, as a matter of law, that a test was not made within a reasonable time. Furthermore, there was evidence tending to show a request made by the plaintiff for a test under the contract, and compliance by the defendant with this request. There was also evidence that a test of the boilers was made, and was paid for equally by plaintiff and defendant.

That a test was agreed upon in the warranty, to be made by a certain person, that complaints were made as to the efficiency of the boilers, that a test was requested, that the expert named in the warranty did make an elaborate test costing $300, that the expense of this was borne equally by both parties, was, in our opinion, substantial evidence that the test required in the warranty, or, at least, a test which was regarded by the parties as a test under the warranty, had been made.

Prof. Barrus, defendant's witness, testified that he made a certain test, saying:

"The test which I made there was a commercial test to determine the evaporative efficiency of these boilers under commercial conditions, by which I mean ordinary working conditions. My report states the evaporative efficiency of these boilers under ordinary working conditions."

An elaborate report in writing was made by Barrus, dated May 19, 1899, copies of which were sent both to the plaintiff and defendant. In this report, under the head of "Results," is this statement:

"45.   Equiv. evap'n per lb. of dry coal from and at 212°, not including economizer, lbs., Apr. 14, 9.497."

Concerning this entry, Barrus testified:

"The statement that the boiler evaporated 9.497 pounds of water from and at 212 degrees per pound of dry coal was a statement of fact which I deter-

mined. It was a test. I did determine the working efficiency; that is, the efficiency of the boilers under working conditions, under ordinary working conditions."

The plaintiff also introduced the evidence of Charles H. Bartlett, a consulting engineer, that the test described in the Barrus report was a proper test under the guaranty, except as to draft, and that the boilers used about one-tenth more fuel by reason of their evaporating only 9½ pounds of water than they would have used if they had evaporated 10½ pounds of water. Evidence was offered showing that the draft was proper.

It is contended by the defendant that the test made by Barrus was not a test under the warranty. In support of this contention, it argues that the object of the test, as stated in the report, was: First, to determine the general economy of the plaintiff's plant under its usual working conditions; and, second, to ascertain what loss of steam or fuel, if any, was going on, and how to remedy it and thereby reduce the fuel consumption. There was also evidence for the defendant tending to show that Barrus was not informed of the terms of the warranty, and was not requested to make a test under the warranty.

Barrus himself distinguished between kinds of tests of the efficiency of a boiler; one being a working or commercial test, which he made, and the other an efficiency or guaranty test, which he says he did not make. He testifies that the test that he made did not conform to the recognized rules of engineers in making a guaranty test. Mr. Barrus said:

"My position is that by tuning the boilers up, by having an expert fireman, and by running them and giving them every advantage, they might be made to evaporate more water than is shown there. I should want, for a guaranty test, an expert fireman."

It is contended by the defendant that, as a matter of law, the warranty is to be interpreted as calling for an efficiency test or guaranty test, as distinguished from a test of working conditions. There is evidence, however, for the plaintiff, that at the time the test was made there was no distinction recognized in engineering practice between commercial tests and guaranty tests.

Ordinarily, a business contract is to be construed in view of the business relations of the parties; but it is quite possible that, in a business contract, the parties may require a guaranty of maximum efficiency in order to secure a safe margin, and that a test of maximum efficiency under the best possible conditions may be agreed to by those who require for practical use a less degree of efficiency. If, however, there are two kinds of tests, we think that it cannot be said, as a matter of law, that the warranty in question calls for either kind in preference to the other.

We think, however, that, where a warranty of this character designates a certain expert to make the test, the conditions of the test ordinarily are to be determined by the expert, and that making the test includes judgment as to proper methods. If, as a matter of fact, there is a distinction between the conditions of commercial and guaranty tests, it is a part of the expert's duty to create the conditions suitable to the

form of test which he adopts. Upon the failure of the parties to plainly designate which of two kinds of tests the expert is to adopt, we think the contract may be fairly construed as leaving it to the expert to make the determination. In this view, we think it essential that the expert should be informed of the terms of the guaranty in order that he may apply his knowledge to the creation of the desired conditions.

If, however, as was testified, there is no distinction between an efficiency test and a commercial test, then we do not see that the question of the expert's knowledge of the terms of the guaranty would be material. It is only upon the supposition that there are in use different modes of conducting a test, and that the mode of conducting a test is a matter of expert knowledge, that it is material that the plaintiff should prove that the expert was informed of the terms of the guaranty. If there was evidence sufficient to go to the jury that the expert was, in fact, informed of the terms of the guaranty, it was open to the plaintiff to argue that the test actually made was selected by him as a suitable and proper test. What are the proofs upon this point?

There is no evidence that the plaintiff communicated the terms of the warranty to Barrus. There is evidence that the defendant's agent agreed to see Barrus and make necessary arrangements with him for the test. A report of the test was furnished to the defendant and to the plaintiff. It describes the test, states the efficiency of the boilers in terms approximating those of the warranty, except that it omits the statement that the draft was one inch. There was evidence that the draft was one inch.

We are of the opinion that it was a question of fact for the jury, whether, in fact, Prof. Barrus was sufficiently informed of the terms of the guaranty. There was a probability that a person named to make a test, and who did go and make an expensive test, the cost of which was divided between the parties, was instructed as to what to do. The test itself is fully described, and is said by the plaintiff's expert to be such a test as was proper under the warranty. There is some similarity between the language of the warranty and of the report. The warranty provides that the boilers "will show an evaporation of 10½ lbs. of water from and at 212° per lb. of dry Pocahontas coal." The results stated are, "Equiv. evap'n per lb. of dry coal from and at 212°, * * * April 14, 9.497."

We think that the plaintiff may well have argued to the jury that the parties under their own practical construction of the warranty treated the test as one made under the contract, and that the defense based upon a distinction between a commercial test and an efficiency test was an afterthought devised to avoid the effect of the test. The improbability that a test was made and paid for without informing the expert what was wanted, the conformity of what he did with what, in the opinion of another expert, he should have done under the warranty, and the use of language in the report closely approximating that in the warranty, we think were matters for the jury on the question whether, in fact, the expert had knowledge of the terms of

the warranty, and exercised his judgment as to the conditions of the test. Unless the expert was to make a choice between two kinds of tests, his knowledge of what results either of the parties desired to show could not have assisted him. In fact, if a purely disinterested judgment was sought, it is quite likely that a more accurate result would be reached by requesting the expert to determine the evaporative efficiency of the boilers rather than by asking him whether the evaporative efficiency of the boilers was a certain amount.

We are of the opinion that the plaintiff was entitled to go to the jury on the first count of the declaration.

It was further contended by the plaintiff that, even if the test proved was not in exact conformity with the warranty, it was nevertheless accepted as such test by the defendant. The Circuit Court was of the opinion that, while there were striking probabilities in favor of the plaintiff upon this proposition, those probabilities were explainable on other theories, and that there was not sufficient evidence to go to the jury.

We are of the opinion, however, that there was evidence that the report made by Barrus was regarded and accepted by the defendant as a report made in conformity with the agreement contained in the original warranty. The learned judge erred, we think, in himself balancing the probabilities on this issue, instead of allowing the jury to do so; and we think that a jury would be warranted in taking a view of the probabilities different from that of the learned judge.

Upon the question of breach of warranty, we are of the opinion that the plaintiff was entitled to go to the jury on the question whether the exact test called for by the warranty had been made.

We are also of the opinion that the plaintiff was entitled to an instruction that, if the jury should find that the exact test had not been made, they should determine whether or not the test actually made was accepted by the parties as a sufficient test under the contract.

Our most serious doubt upon this warranty arises, however, not upon the question whether a test was made, or whether the test which was made was accepted by the defendant as the test called for, but upon the question whether the plaintiff had sufficiently proved that the test made did not show the warranted efficiency. This doubt arises upon the report of Prof. Barrus. While it is quite true that this report shows an evaporation of only 9.497, it also contains "certain conclusions as to the economy of the plant as based on the test of April 14, 1899," and the expression, "and I attribute the observed deficiency, not to the boiler itself, but to inefficient firing." This raises a doubt whether the plaintiff's own proofs were sufficient to show that the test developed the fact that the boilers would not show an evaporation of $10\frac{1}{2}$ pounds. But the ruling of the court as to the sufficiency of the evidence was based upon the whole of the evidence submitted by both plaintiff and defendant, and we are of the opinion that the oral evidence of Prof. Barrus, in addition to the report offered in evidence, together with the evidence of plaintiff's expert, gave to the plaintiff the right to go to the jury upon the question whether or not the test did show the required evaporation.

The third count relates to the brickwork surrounding the boilers. By the original contract, the brickwork was to be provided by Thayer & Co. (defendant's agents), and, concerning its erection, it was agreed:

"Full drawings and directions for erecting to be furnished, and services of a man to superintend erection, board and traveling expenses to be paid by Thayer & Co., who is also to furnish and perform all other labor."

It was stipulated that:

"By agreement between the plaintiff and defendant, said contract was subsequently modified so that the plaintiff undertook to furnish the labor and materials for the erection and setting up of said boilers, and the defendant agreed to direct and supervise said erection and setting up in a proper and skillful manner."

It was agreed that the defendant sent Mr. Park to direct and supervise the work on its behalf. It appeared that in accordance with the specifications, drawings and directions were furnished, which showed that the bricks were to be tied. The plaintiff introduced evidence tending to show that the tying, in pursuance of the directions of Mr. Park, was omitted, by reason whereof the brickwork fell, to the plaintiff's damage. Evidence was offered tending to show that the omission of the ties was improper, and that the omission of the ties was a breach of the defendant's duty to direct and supervise said erection and setting up in a skillful manner.

We cannot agree with the plaintiff's contention that upon the record it appears that the clause concerning the furnishing of drawings and directions was superseded by the oral contract. While the contract was subsequently modified, it does not appear that the defendant was relieved from the duty of furnishing drawings and directions, or that the following of plans becomes immaterial.

It is contended by the defendant that, as a matter of law, the superintendent, Park, had no authority to waive the requirements of the plans, which showed tying. This contention, however, is of no consequence, unless it should appear that the plaintiff agreed with Park to omit the tying.

We are of the opinion that it was the duty of Park, in superintending the erection, to follow the plans, and that the evidence that Park failed to see that the bricks were tied tended to show a breach of the original agreement to furnish services of a man to superintend erection, as well as of the modified agreement of the defendant to direct and supervise said erection and setting up in a proper and skillful manner. We cannot agree to the contention that the lack of authority of Park to depart from the plans would relieve the defendant from liability in case Park should fail to follow the plans. This, we think, might be a failure to direct and supervise said erection and setting up in a proper and skillful manner.

The most important point for the defendant on this issue is the contention of the defendant that the departure from the plans was made with full knowledge of the plaintiff, and without objection. The Circuit Court was of the opinion that the plaintiff itself permitted Mr. Park's orders to omit the ties to be carried out. The learned judge

was also of the opinion that Mr. Sears, who was to furnish labor and materials, stood for the plaintiff corporation, and that Mr. Park stood for the defendant corporation. Our attention, however, has been called to no evidence that Mr. Sears, who had been employed to do the brickwork, had been given any authority by the plaintiff corporation to act for it in waiving the contract.

The positions of Mr. Park, whose duty it was to supervise, which included the duty of seeing that the plans were followed, and of Mr. Sears, who was employed to do the brickwork, were quite different. We cannot assume that it was the duty of Mr. Sears to make an independent examination of the drawings and specifications. Sears testified that he himself and his men had nothing to do with the method in which the boilers were set, and that, without knowing anything about the circumstances, he thought the ties ought to be put in, but that he told his men to do as Mr. Park said. The only evidence which we find in the pages of the record referred to on the defendant's brief, tending to show a voluntary submission by the plaintiff to the departure from the plans, is the following: That Sears' foreman, Vibberts, spoke to Sears about the improper way in which the brickwork was being done, and said, "Park says do it that way." "I said, 'We take our orders from Mr. Park. I will go and speak to Mr. Bodge about it.' After my talk with Bodge, I told him (Vibberts) to go ahead, and he said no more—to do it as Park told him to." Here was evidence tending to show the communication to Mr. Bodge, the treasurer, of the fact that the plans were departed from.

There is no evidence, however, showing at what portion of the progress of the work this was done, and we do not think that as matter of law this evidence conclusively proved the assent of the corporation to a variation of the plans. The plaintiff made out a prima facie case, and offered sufficient evidence to go to the jury on the issue of failure to properly supervise. To meet this evidence, the defendant argues that the departure from the plans was authorized by the plaintiff corporation. The authority of Sears, or that he was in any sense a representative of the corporation in the matter, was not proved. The mere fact that at some time during the progress of the work Sears had an indefinite talk with Bodge, and thereafter told his foreman to go ahead, is not sufficient to authorize a ruling that, as matter of law, there had been a waiver of the specifications, or an assent to improper work. Mr. Bodge testified, on the other hand, that he did not look at the plans, did not see the bricks tied in place, and that he did not know anything about it. Mr. Park testified that the brickwork was tied in the way called for by the plans, that no ties were omitted, and that it was properly and sufficiently done; and his testimony is inconsistent with the theory that he in any way relied upon a waiver by Mr. Bodge, or even by Mr. Sears, in departing from the plans.

The twentieth assignment of error relates to the exclusion of the following question:

"When there is a superintendent of construction or a superintendent of erection, as distinguished from the man who furnishes the labor and materials, whose business is it, under the practice of engineers, to see that the plans are followed?"

We are of the opinion that this question was rightly excluded, upon the ground that the question of the construction of this contract was for the court, and was not a question for an expert.

The twenty-first assignment of error relates to the exclusion of a letter of Thayer & Co., the defendant's agent, to the defendant, dated September 13, 1900. The plaintiff's brief does not present the question of the correctness of the rulings of the Circuit Court upon the offer of this proof at the trial, but argues that the letter was admissible for various purposes which appear to us different from those for which it was offered. The question whether the letter was admissible for any purpose is not raised by an exception to a ruling excluding it when offered for a particular purpose.

The twenty-second assignment of error is obviously without merit. It was clearly permissible to show the instructions given to Barrus concerning the test.

We think that, in instructing the jury that the plaintiff was not entitled to recover on either of the first three counts of the declaration, the Circuit Court was in error, and that the plaintiff was entitled to go to the jury on each of said counts.

The judgment of the Circuit Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion; and the plaintiff in error recovers costs in this court.