### SOUTHERN PAC. CO. v. FORE RIVER SHIPBUILDING CO.

(Circuit Court of Appeals, First Circuit. November 11, 1914.)

No. 1045.

1. CONTRACTS &#9758;281—CONSTRUCTION—CONTRACT FOR BUILDING STEAMSHIP—
WARRANTIES—"SUCH MANAGEMENT AGREED UPON BY THE PARTIES TO BE PROPER."

A contract for the building of a steamship, with a warranty that it should, "under such management as shall be agreed upon by the parties to be proper," show with a given displacement on a round trip from New York to New Orleans an average speed of 16 knots, with a total average consumption of coal of a stated quality not exceeding 7 tons per hour, required the parties to agree in advance of a trial trip, so far as they reasonably could, upon proper management and conditions whereby the vessel could be given a fair test as to her ability to fulfill the warranty, and an agreement after the trip that the trial had been a fair one was not essential to render it binding upon the builder.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1281–1283; Dec. Dig. &#9758;281.]

2. CONTRACTS &#9758;281—CONSTRUCTION AND OPERATION—CONTRACT FOR BUILDING STEAMSHIP—WARRANTY.

The provision of such contract for an agreed management on the trial trip precluded the parties, after such agreement had been made, from claiming that the officers and men in charge of the ship were incompetent, or their number inadequate, but not from showing the manner in which the ship was actually handled, for the purpose of determining whether the implied agreement that the tests should be fairly conducted had been complied with.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1281–1283; Dec. Dig. &#9758;281.]

3. DAMAGES &#9758;123—BREACH OF CONTRACT—FAILURE TO FULFILL WARRANTY.

On recovery in an action for breach of a warranty of speed and coal consumption in a contract for the building of a steamship, which made it necessary for plaintiff to substitute new engines and make other alterations incident thereto, after the ship had been put into service, the plain-

---

&#9758;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tiff is entitled to recover as elements of damages the cost of such changes and for the loss of the use of the vessel while they were being made.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 320-325; Dec. Dig. 🔑123.]

Putnam, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Action at law by the Southern Pacific Company against the Fore River Shipbuilding Company. From the judgment, plaintiff brings error. Reversed.

See, also, Fore River Shipbuilding Co. v. Southern Pac. Co., 219 Fed. 387, 135 C. C. A. 129.

Robert M. Morse and William D. Turner, both of Boston, Mass. (Reginald Foster, George Hoague, and Foster & Turner, all of Boston, Mass., on the brief), for plaintiff in error.

Sherman L. Whipple and Samuel H. Pillsbury, both of Boston, Mass. (Guy W. Currier and Philip G. Carleton, both of Boston, Mass., on the brief), for defendant in error.

Before PUTNAM and BINGHAM, Circuit Judges, and MORTON, District Judge.

BINGHAM, Circuit Judge. This action was brought by the Southern Pacific Company, a Kentucky corporation, against the Fore River Shipbuilding Company, a Massachusetts corporation, in the District Court for the District of Massachusetts, to recover damages for an alleged breach of a contract of guaranty as to the speed and coal consumption of a steamship which the defendant contracted to build and sell to the plaintiff for use in its transportation service between the ports of New York and New Orleans, and for certain sums of money alleged to be due for work and labor performed and expenses incurred at the defendant's request. The declaration as originally drawn contained 20 counts. Since then the plaintiff has waived counts 9, 10, 11, 12, 14, 17, 18, 19, and 20; that part of count 3 relating to damages for delay in the completion of the ship prior to its original delivery, and for time required to substitute new boilers; and that part of count 2 relating to expenses to be incurred for new boilers. No question is raised as to counts 5, 7 and 8, upon which verdicts were directed for the plaintiff. The first count reads as follows:

"And the plaintiff says that on or about the 14th day of July, 1905, the defendant entered into a contract in writing with the plaintiff, of which a copy is hereto attached, marked 'A,' whereby the defendant, in consideration of the sum of $1,000,000, to be paid by the plaintiff in installments, as therein provided, agreed to build for the plaintiff, in accordance with certain plans and specifications, a steamship, to be fitted with twin screw Curtis marine turbine engines and water tube boilers, and to deliver the said steamship, complete and ready for use, at one of the plaintiff's piers in the port of New York, within 20 months from the said 14th day of July, 1905, the date of the execution of said contract, or as much sooner as possible.

"And in and by the fourth clause of said contract the defendant agreed and guaranteed that the said steamship, when constructed in accordance with said plans and specifications, should show an average speed of 16 knots

per hour, in ordinary weather, under such management as should be agreed' upon by the parties to be proper, on a displacement not exceeding 10,000 tons on sailing, on a round trip between New York and New Orleans, between the points of sea departure at each port, and further agreed and guaranteed that the total coal consumption for the engines, including auxiliaries, in making the above-named speed, under the said conditions, should not exceed an average of seven tons of coal per hour, of a quality equal to the Clearfield, Berwind-White, or Cumberland, containing not less than 14,000 British thermal units per pound; and it was provided, further, that the defendant should have the right to have an engineer of its own selection present in the engine room of the steamer on any such round trip, who should have opportunity to observe and inspect the coal used.

"And in pursuance of said agreement the defendant constructed a certain steamship, which was named 'Creole'; and the plaintiff paid to the defendant, pursuant to the provisions of said contract, in installments as therein provided, the sum of $900,000, the last installment of $100,000 not being payable until after the plaintiff should accept said ship, which the plaintiff never did because the said ship failed to conform to the requirements of said contract as regards speed and coal consumption; and the defendant, from time to time, after delivering said ship to the plaintiff, made various changes in her propellers and other machinery, in attempting to make her conform to the said requirements as to speed and coal consumption, but without success.

"In order thoroughly to test the said ship as originally completed, and also as altered from time to time by the defendant, the plaintiff allowed the said ship to make 14 round trips between New York and New Orleans under the conditions named in said contract; but the said steamship always failed to make more than an average of about 13½ knots an hour, while, on the other hand, her coal consumption always greatly exceeded the contract requirements, so that the plaintiff was put to great loss and damage, and will be put to still further loss and expense, in order to make said steamship serviceable and profitable for the business for which she was intended.

"And the plaintiff says that, by reason of the breach of said agreement and guaranty on the part of the defendant, the plaintiff has sustained damages to the amount of $600,000, and the defendant owes the plaintiff said amount."

The second count is like the first, with the exception that the concluding paragraph reads as follows:

"And the plaintiff says that by reason of the breach of said agreement and guaranty on the part of the defendant it became necessary for the plaintiff to employ other shipbuilders to remove the said engines and to substitute others, at the reasonable expense of $263,005; * * * and the defendant owes the plaintiff said amount, with interest thereon."

The third count is to recover damages alleged to have been incurred through loss of the use of the ship for 136 days, from August 9, 1907, to December 23, 1907, while she was undergoing repairs after the first trip to New Orleans; for 121 days, from July 4, 1908, to November 4, 1908, while she was laid up and undergoing repairs after the tenth trip; for 182 days, from January 26, 1909, to July 28, 1909, while she was laid up after the fourteenth trip; and for 285 days thereafter, during which time the turbines were removed and reciprocating engines were insalled at Cramp's; and it is alleged that the value of the ship for charter in the market was $400 per day.

The fourth count is to recover the sums paid for insurance while the ship was laid up and repairs were being made during the periods above stated.

The sixth and thirteenth counts are to recover the value of stores and equipment on the ship, alleged to have been used, lost, or destroyed

by the defendant while the ship was in its possession after the first and tenth trips to New Orleans.

The sixteenth count is to recover the expenses alleged to have been incurred in returning the ship to the defendant's yard at Quincy after the first trip, in protecting the plaintiff's property on board the ship while she was in the defendant's possession, and for traveling expenses of officers and men from New York to Quincy to take the ship back to New York after the repairs were made.

The case was originally sent to an auditor, who heard the parties and filed his report. Later it was set for trial before a jury. At the trial the plaintiff introduced the auditor's report, and rested, and at the close of all the evidence, the court having made certain rulings as to the meaning of the guaranty clause in the contract, and having declined to give certain instructions requested by the plaintiff relating to the same subject, the plaintiff excepting, and, in view of the rulings, not desiring to have the issue whether or not there had been a breach of the guaranty submitted to the jury, the jury were directed to return a verdict for the plaintiff for the amount found due by the auditor under the fifth, seventh, and eighth counts of the declaration. with interest from the date of the writ, to wit, for the sum of $2,948.-41, the same being for certain towage charges, the cost of shifting the propeller and the expense of the Diamond Shoals trip.

[1] The fourth paragraph of the contract contains a provision wherein the defendant "guarantees that the steamship * * * shall, under such management as shall be agreed upon by the parties to be proper, show, on a displacement not exceeding ten thousand (10,000) tons on sailing on a round trip between New York and New Orleans, between the points of sea departure at each port an average speed in ordinary weather of 16 knots per hour," and "that the total coal consumption in making the above-named speed under the above-named conditions shall not exceed an average of seven (7) tons of coal per hour, including auxiliaries, of a quality equal to the Clearfield, * * * containing not less than fourteen thousand (14,000) British thermal units per pound." The present controversy hinges largely on the meaning which the parties intended to convey by the language used in this provision of the contract.

The plaintiff's contention is that the words, "under such management as shall be agreed upon by the parties hereto to be proper," mean that before a trial trip under the guaranty should take place over the designated route, the parties should agree upon the captain and chief engineer who were to take charge of the ship during the trip, and the number of subordinates, such as assistant engineers, firemen, water tenders, coal passers, and oilers, having due regard for the number ordinarily employed on service boats of this character and the accommodations provided on the ship, and that the chief engineer, as was customary, should select the subordinates; that the practical construction put upon the contract by the parties, as disclosed by the evidence, shows that they so understood the matter and endeavored to act accordingly in arranging the trips. In addition to this, the plaintiff contends that this provision of the contract also means that the parties, by agreeing in advance of a trip upon the men who were to officer the ship and the

number of subordinates, thereafter became precluded from showing not only that the officers and men selected were incompetent and the number of subordinates inadequate, but also that the officers and men on any such trip negligently managed the ship, so that it did not have a fair trial. In other words, that the parties, by agreeing in advance, decided that the officers and men were competent, the number adequate, and that the test would be one by the result of which the parties would be bound.

The defendant, on the other hand, contends that the language of the contract as to this matter is ambiguous; that under the circumstances it would not be reasonable to suppose the parties intended an agreement should be made in advance of a trip that the management would be proper and the trial a fair one, without knowing or having the means of knowing that it was in fact so; that this provision really relates to and was intended to mean that the parties should agree subsequent to a trip that the trial had been a fair one; and that, if they did not subsequently agree, then the trip would be of no consequence in determining the rights of the parties under the guaranty. It is this view of the contract that was taken by the court below in stating his rulings to the jury, and to which the plaintiff excepted. In his rulings the court, after stating the various contentions of the parties and reading from the contract the clause here in question, said:

"The guaranty from which I am reading contains nothing express as to the time when that agreement shall be made. On the one hand, the Southern Pacific Company contends that the agreement means an agreement to be made before the trial trips are entered upon; and, on the other hand, the Fore River Company contends that it does not mean an agreement before the trip, that it does mean an agreement after the trip, and that it was open to the defendant to the Fore River Company, after having knowledge of the management on a given round trip, to claim that it was not proper. * * * Taking the language of the guaranty just as it stands, therefore, there are different meanings which may be given to the contract. The parties have not made it clear by the terms which they have used in contracting just which of those meanings they intended. Under those circumstances, it is the duty of the court to settle the meaning, to determine the meaning, for the purposes of this case. * * * I have, therefore, determined the meaning to be that contended for by the Fore River Company—the meaning of the guaranty on these two points to be that contended for by the Fore River Company, namely, that 'management' means the actual handling of the vessel, and that an agreement regarding it was not an agreement to be made before the trial trips were entered upon, but afterwards. Now gentlemen, in view of those rulings, I have been informed by counsel for the Southern Pacific Company, they do not claim that any agreement was made after the trial trips that the handling of the ship upon those trips was proper, and that in view of the rulings of the court, which I have indicated to you, which they do not accept—to which they object and to which they except for the purpose of ascertaining on appeal whether they are right or not—they do not now ask to have the issue whether or not there has been a breach of guaranty submitted to the jury."

Now, it is apparent from the foregoing that the court ruled the word "management," as employed in the guaranty clause of the contract, meant the actual handling of the ship on any given trip; that the agreement as to management there provided for was to be entered into by the parties subsequent to a trial trip; that there could be no recovery under the guaranty, without proof that after one or more of the

trips shown in evidence the parties had agreed that the management of the ship on such trip or trips was proper and the trials fair ones; and that in view of the rulings, thus limiting the issue, the plaintiff did not care to go to the jury, preferring to rely upon its exception.

This being the situation, we are of the opinion that the ruling of the court was erroneous. The meaning of the contract as to this matter is reasonably certain, especially when viewed in the light of the conduct of the parties in their endeavor to comply with its terms before the trips took place, and that is that the parties intended by this clause of the contract to provide in advance, so far as they reasonably could, means whereby a fair trial or test of the ship's ability to comply with the terms of the guaranty could be had, and that no test under the guaranty should take place unless the parties agreed before a trip was had upon the officers who should take charge of the ship, and the number of subordinates who were to work under them. This is the limit to which their express agreement as to management extends. The contract does not provide, as is sometimes the case, that the agreed management shall constitute a board of arbitrators to make tests and state results by which the parties shall be concluded, and contains no provision that the tests shall be fair. It does, however, provide for trial tests, and such being the case the law will imply an obligation that the tests called for shall be fair. Arkwright Mills v. Aultman Co., 145 Fed. 783, 76 C. C. A. 347. But it does not follow from this that the parties contemplated that an agreement subsequent to the trials was necessary in order to determine their rights under the guaranty, or that they would not be bound by the result, if the trips were made under an agreed management and were fairly conducted. There was evidence from which it could have been found that the parties agreed in advance upon the management of the vessel as herein defined, that trial tests were had under such management on which the ship failed to make the round trip at an average speed of 16 knots an hour or within the specified coal consumption, and that the tests were proper. The plaintiff, therefore, was entitled to go to the jury upon these questions, and should not have been required to show an agreement subsequent to the tests that they had been properly conducted.

[2] The effect of the provision for an agreed management is this: If the parties enter into the agreement, trips made by the vessel over the designated course under such management would be tests under the guaranty by which the rights of the parties could be determined. In such case evidence that the officers and men in charge of the ship were incompetent or their number inadequate would not be admissible to show that the management was improper and the trials unfair, for, to this extent, the parties would be precluded by their agreement; while evidence as to how the ship was actually handled on any such trip would be admissible for the purpose of determining whether the implied obligation, that the tests should be fairly conducted, had been complied with. If the parties fail to enter into the agreement as to management, trips made by the vessel over the course would not be tests under the guaranty. In that event the plaintiff could not maintain its action for breach of guaranty, and it would avail the defendant

nothing to show that the officers and men who conducted the trips were incompetent or their number inadequate.

The auditor has found and the evidence discloses that on all of the 14 trips that were made the ship failed to comply with the guaranty and to maintain an average speed of 16 knots per hour, to say nothing of the coal consumed, and that it did not equal the time fixed in the regular service schedules of the Southern Pacific Company on the last four trips, if it did on any. These facts do not seem to have been controverted at the trial. It further appears that, notwithstanding the repairs and alterations made to the ship after the first trip, the performance of the ship grew steadily worse until the end of the tenth, when she was laid off. A conference was then had in New York between Mr. Jungen, the manager of the Southern Pacific Company and Admiral Bowles, president of the Fore River Company, and other representatives of the two companies. At this conference Jungen informed Bowles that the ship had been laid off, and asked what he was going to do about it. Bowles replied that he was not going to do anything, that the failure of the ship was due to bad management, to inefficient and inadequate fireroom service, and to the use of salt and muddy water. To this Jungen replied that he (Bowles) had selected the guaranty engineer (for the last eight or nine trips), who had authority to select his own assistants and the whole fireroom crew, and if that was his attitude he wanted him to write a letter to the president of the Southern Pacific Company and state his case, that he (Jungen) would write a letter to the president telling him to call the guaranty of the Fore River Company, and that he would also recommend taking out the turbines and putting in reciprocating engines. Thereupon Bowles said they had better come to an understanding. A discussion ensued as to what could be done to make the ship good. It was then arranged that the ship should go back to the defendant's yard at Quincy for repairs, that a forced or assisted draft should be installed in the fireroom, a vacuum augmenter should be added, and a more efficient screw installed. There was discussion as to whether the Southern Pacific Company would pay for the forced draft. Jungen declined to pay any of the expense, on the ground that it was up to the Fore River Company to make good under the contract. Bowles finally agreed that his company would "make good," but in giving his testimony said that it was on the understanding that Jungen would accept the ship and put her on the line of the Southern Pacific Company, if she could make her schedule on a decent coal consumption. On the other hand, there was evidence that Jungen said he would recommend the acceptance of the ship, if she could make the schedule on a reasonable coal consumption, and the auditor finds the latter is the true version. Except as to the last proposition, the evidence of all the witnesses is in accord, and the only reasonable conclusion that could be drawn from the arrangement here presented is that the Southern Pacific Company agreed to forego any right it then had to enforce the guaranty for failure on the part of the ship down to that time to meet the contract requirements as to speed and coal consumption; that the Fore River Company agreed to make the repairs and alterations, and to forego any right it had to insist that the previous trips were not fairly managed; that past dif-

ferences were to be eliminated, and the rights of the parties under the guaranty determined by the result of the future trials or tests, after the repairs and alterations then agreed upon were made. Whether the guaranty, as respects future trials, was modified, so as only to require the ship to equal the time fixed in the service schedules of the Southern Pacific or not is of little consequence, for, as above stated, the ship never equaled that time on any round trip after the tenth. But, however this may be, we think that what took place at this time would not warrant a finding that the guaranty was waived, and that there was no evidence in the case that would justify the conclusion that the plaintiff lost its right to require the defendant to comply with the guaranty, either as originally drawn or as modified, if it could be found to have been modified. No claim of this kind was made until after this litigation was begun, and the conduct of the parties discloses they understood that the guaranty was in full force down to the interview after the tenth trip, and was in force in its original or modified form thereafter, and that from the beginning to the end it was their endeavor to comply with the contract, and to see if the ship, equipped as it was with turbine engines and water tube boilers, could fulfill the guaranty.

The rights of the parties under the guaranty, not being dependent upon the success or failure of the trips prior to the eleventh, evidence in relation to them on a subsequent trial of the case will be of no consequence in determining the issues, and should not be received. But as their rights are to be determined by the success or failure of the trials that took place after the tenth trip, and as the contract contemplates an implied obligation that those trials should be fairly conducted, it will be open to the parties to show that on the subsequent trips the officers and men engaged were careful or otherwise in the performance of their duties, and that the trials were fair or unfair, as the case may be.

It is unnecessary to consider further the plaintiff's exceptions to evidence. From what has already been said, it can be readily understood what was competent and what should not have been received.

The verdict ordered for the plaintiff, to the extent that it goes, is undoubtedly correct, and, although the judgment entered thereon must be reversed, no reason appears why the verdict should not be allowed to stand, so that it may be added to any further sum that may be found due the plaintiff.

The ship having failed on the eleventh, twelfth, thirteenth, and fourteenth trips to comply with the guaranty as originally drawn or as modified, at a subsequent trial of the case it will be incumbent upon the plaintiff to prove (1) that the parties agreed in advance upon the management for one or more of the four above-named trips, and that they were made under such management; (2) that the failure of the ship to comply with the guaranty was due to its inability to fulfill the contract and not to the want of a fair trial; and (3) the damages it sustained.

[3] Upon the question of damages the auditor has found that the reasonable expense incurred by the plaintiff in substituting the reciprocating engines and making the accompanying alterations and repairs

was $263,500; that the time consumed in making these alterations and repairs was 288 days; that the fair value of the use of the ship was $400 per day; and that the damage sustained by the plaintiff from the loss of the use of the ship during this period was fairly recoverable as a part of the cost of making the ship comply with the guaranty This was also the view taken by the court at the trial. We see no reason why these items are not proper elements of damage for the jury to consider. If, as is probable, the expense of insuring the ship during this period was included in the $400 per day, which the auditor finds was the fair value of the use of the ship, and which the plaintiff alleges was the value of the ship for charter in the market, then this sum should not be again included; otherwise, it may be considered, as we think it is fairly a part of the expense of making the ship comply with the guaranty.

The auditor has found against the plaintiff as to the other items of damage claimed in the various counts in the declaration, and, as the plaintiff does not insist upon them, we do not pass upon them.

It is understood that there is no disagreement among members of the court as to the construction of the contract; that the disagreement relates to whether the questions discussed are properly before the court on the exceptions taken by the plaintiff in error to the rulings of the trial judge.

The judgment of the District Court is reversed, the case is remanded to that court for further proceedings not inconsistent with this opinion, and the plaintiff in error recovers its costs of appeal.

PUTNAM, Circuit Judge (dissenting). I am compelled to dissent in this case. It is too important a case to be disregarded in the particulars to which I call attention. The opinion of the court is based upon severed portions of the record, when everywhere it is properly understood that the whole of a record or of any instrument should be taken together, under the ordinary rules of interpretation, by virtue of which various portions of any instrument or record are to be construed in the light of the context.

Quite early in the trial of the case the following colloquy between the court and counsel for the Southern Pacific Company occurred, namely:

"Mr. Morse: But your honor has not ruled that that was not what the parties agreed upon as proper management, and that is what we are contending for. We say that it was the clear intention of this contract, as expressed in the contract, that the parties should agree before each trial in regard to the management for that trial, and that having agreed upon that management then the Southern Pacific is no more responsible for the carelessness or the neglect of an individual.

"Dodge, J.: I understand you say that, but I have been obliged to rule that I cannot take it that way; that I must regard 'management' as meaning what was done, how the ship was actually handled during the trial trip.

"Mr. Morse: We have not so understood your honor. Do I understand, from that, that if an individual water tender or fireman failed in his duty, the Southern Pacific is responsible for it?

"Dodge, J.: Oh, no; I have not said that; I have not said that.

"Mr. Morse: Well, I don't quite understand your honor's ruling. We say that before each trial these parties agreed upon the management under

which the ship should be sailed. Take, for instance, the ten trials, where Mr. Bowles himself selected the chief engineer, and paid for the chief engineer, and the ship was run under his management. Now, are we responsible for those if they were defects, if there were failures, on the part of men to perform their duty? Where is there room for any questions? The parties have agreed on the management; they have agreed that Jacobs shall be captain; they have agreed that Goudy shall be chief engineer; and they have agreed, as the evidence will show, that the chief engineer shall select his subordinates.

"Dodge, J.: I have not undertaken to rule in detail on exactly what 'management' shall mean during the trip; but I have ruled that I cannot say that, because you put the ship into agreed hands at the beginning of a trip, therefore the whole management during that trip was agreed on as proper.

"Mr. Morse: It is pretty difficult to follow that statement. If the parties before the voyage say that 'we agree that this ship shall be managed and operated in a certain way and by certain people, and that the results of that operation shall establish whether or not she performs the guaranty or not,' we say that, after they have agreed to that, and that is an agreement that that shall be a test of the ship.

"Dodge, J.: I understand that, but I cannot quite see it in that way. Well, I will consider this until to-morrow morning."

These extracts state clearly the issue involved as the case was made by the parties to it. The Southern Pacific Company claimed that, inasmuch as certain persons had been selected for the management of the ship during the trial trips, the selection was conclusive, to which proposition the Fore River Company did not agree. The court, in substance, maintained that, inasmuch as the ship had been intrusted to the possession and custody of the Southern Pacific Company to make the trial trips, the duty of ordinary diligence which the law imposes on a bailee rested throughout on the Southern Pacific Company. Notwithstanding the particular expressions used by the court, this was its position throughout the subsequent case; and this was the real issue in controversy. When the court finally determined that it should so rule, the Southern Pacific Company abandoned the contest and relied upon its exceptions as to the law. On that issue the court was correct, and that overshot all other issues in the case.

Before understanding the case, it must all be examined from the departure point of the extract which we have made.